PARKS HIWAY ENTERPRISES,
LLC, Appellant,

v.

CEM LEASING, INC., James E. Weymiller, Steven C. Winquist and Phillip M. Tannehill, individually and operating as "Petroleum Sales, Inc.," Appellees.

No. S–8593.

Supreme Court of Alaska.

Feb. 4, 2000.

Peter J. Aschenbrenner, Sheila Doody Bishop, Aschenbrenner Law Offices, Inc., Fairbanks, for Appellant.

Daniel T. Quinn, Gregory R. Henrikson, Richmond & Quinn, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

## I. INTRODUCTION

After Parks Hiway's groundwater was contaminated by fuel leaking from an adjacent service station, it sued the station's fuel supplier, Petroleum Sales. The superior court granted summary judgment to Petroleum Sales, finding its relationship to the contamination too remote to impose statutory or common law liability. Parks Hiway now appeals the court's dismissal of its various claims. Because we agree with the superior court's findings, we affirm.

## II. FACTS AND PROCEEDINGS

Phillip and Genevieve Carboy have owned and operated the Gold Hill Service Station in Fairbanks since 1981. Throughout the Carboys' ownership, Gold Hill maintained up to three underground storage tanks on its property to hold gasoline. Although the Carboys checked their tanks periodically for leaks, they failed to comply with regulations requiring tank operators to report the tanks' registration numbers, proof of financial responsibility, and proof of testing to the state.

From 1981 until 1994, Petroleum Sales, Inc., supplied petroleum products to Gold Hill. When Gold Hill required additional fuel, Phillip Carboy would telephone Petroleum Sales and place an order. Petroleum Sales would then deliver the product to Gold Hill and directly fill the appropriate tanks. Carboy did not instruct Petroleum Sales' delivery personnel on how to fill the tanks during this process.

Gold Hill and Petroleum Sales are independent, separately owned, unaffiliated companies. Petroleum Sales did not oversee, manage, or operate the Gold Hill station and did not construct, install, maintain, or test the station's tanks. Moreover, Gold Hill never asked or authorized Petroleum Sales to perform any such work.

Parks Hiway Enterprises, LLC, owned the parcel adjacent to the Gold Hill station. In 1994 the Alaska Department of Environmental Conservation (the Department) determined that benzene had contaminated the groundwater under Parks Hiway's property. The Department identified Gold Hill as a probable source of the pollution. Gold Hill promptly removed its tanks, after which investigators discovered that the soil and groundwater surrounding the tank area were heavily contaminated with petroleum components. The rate of leakage was estimated at approximately one to two quarts per month over a twenty-year period.

Parks Hiway subsequently ceased drawing drinking water from its well. Parks Hiway suffered economic loss as a result of this action.

Parks Hiway sued the Carboys in 1995 and settled with them in 1996. In 1997 Parks Hiway filed an amended complaint naming Petroleum Sales as a defendant. Parks Hiway's amended complaint also named as defendants CEM Leasing, Inc., James E. Weymiller, Steven C. Winquist, and Phillip M. Tannehill. We refer to these defendants collectively as "Petroleum Sales." The complaint alleged that Petroleum Sales was responsible for the soil and groundwater contamination of Parks Hiway's property, and it

asserted claims under strict liability, nuisance, trespass, and negligence theories.

Petroleum Sales moved for summary judgment in March 1997. The superior court granted Petroleum Sales' motion on December 16, 1997. Parks Hiway subsequently moved both for reconsideration and to file an amended complaint. The superior court agreed to reconsider its ruling. But in its January 23, 1998, order granting final judgment to Petroleum Sales, the court ultimately denied both of Parks Hiway's motions.

Parks Hiway appeals the superior court's grant of summary judgment to Petroleum Sales, the denial of its motion to submit an amended complaint, and the court's refusal to strike two affidavits Petroleum Sales submitted during the summary judgment proceedings.

## III. DISCUSSION

### A. Standard of Review

We review grants of summary judgment de novo.[1] We will affirm the ruling if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[2] We draw all reasonable inferences of fact in favor of Parks Hiway as the non-moving party.[3] Because this case involves various questions of law, we are not bound by the lower court's decision and will instead adopt the rule of law "most persuasive in light of precedent, reason, and policy."[4]

### B. The Superior Court Did Not Err by Granting Summary Judgment to Petroleum Sales on Parks Hiway's Statutory Strict Liability Claims.

Alaska Statute 46.03.822 imposes strict liability on the owners and transporters of hazardous substances for unpermitted releases of the substance.[5] Parks Hiway argues on appeal that the superior court erred by refusing to characterize Petroleum Sales as an "owner," "person having control," or "transporter" of the fuel.

#### 1. Petroleum Sales was not an "owner" or "person having control" under AS 46.03.822(a)(1).

Alaska Statute 46.03.822(a)(1) imposes strict liability on "the owner of, and the person having control over, the hazardous substance at the time of the release." The superior court found subsection .822(a)(1) inapplicable to Petroleum Sales, ruling that the company neither owned nor controlled the fuel when it leaked from Gold Hill's tanks and contaminated the underlying groundwater. Parks Hiway challenges the court's conclusion, arguing that Petroleum Sales still

1. *See Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995).

2. *See Voigt v. Snowden,* 923 P.2d 778, 781 (Alaska 1996).

3. *See Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995).

4. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

5. The text of AS 46.03.822 provides in relevant part:

(a) Notwithstanding any other provision or rule of law and subject only to the defenses set out in (b) of this section, the exception set out in (i) of this section, the exception set out in AS 09.65.240, and the limitation on liability provided under AS 46.03.825, the following persons are strictly liable, jointly and severally, for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village, resulting from an unpermitted release of a hazardous substance or, with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance:

(1) the owner of, and the person having control over, the hazardous substance at the time of the release or threatened release....

(2) the owner and the operator of a vessel or facility, from which there is a release, or a threatened release....

. . . .

(5) any person who accepts or accepted any hazardous substances, other than refined oil, for transport to disposal or treatment facilities, vessels or sites selected by the person, from which there is a release, or a threatened release that causes the incurrence of response costs, of a hazardous substance.

retained control over the fuel even after title had passed to Gold Hill.

### a. *Petroleum Sales was not an "owner" of the fuel at the time of the release.*

Alaska's hazardous substance statute defines "owner" for purposes of AS 46.03.822(a)(1) in circular terms.[6] Other courts confronting the equally circular definition of "owner" under the corresponding Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) provision have given the term its ordinary meaning.[7] The superior court employed a title theory of ownership for purposes of AS 46.03.822(a)(1), under which the "owner" is the person holding title to the fuel upon its transfer into Gold Hill's tanks. The court relied on *Redwing Carriers, Inc. v. Saraland Apartments,* which interpreted the term "owner" for purposes of CERCLA liability as the party holding title to the polluted site.[8] Parks Hiway offers no authority supporting a contrary definition.

■ We agree with the superior court. As a movable good, the fuel that Petroleum Sales supplied to Gold Hill was governed by AS 45.02, Alaska's version of the Uniform Commercial Code (UCC).[9] Alaska Statute 45.02.401(2) provides that "unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods." Title to—and thus, ownership of—the fuel therefore

transferred to Gold Hill when Petroleum Sales deposited it into the latter's tanks.[10] Because Petroleum Sales owned neither the fuel nor the facility from which the fuel leaked when the contamination of Parks Hiway's groundwater occurred, Petroleum Sales is not an "owner" under AS 46.03.822(a)(1).

### b. *Petroleum Sales was not the person "having control over the [fuel] at the time of the release."*

■ Alaska Statute 46.03.826(4) defines "having control over a hazardous substance" as

producing, handling, storing, transporting, or refining a hazardous substance for commercial purposes immediately before entry of the hazardous substance into the atmosphere or in or upon the water, surface, or subsurface land of the state, and specifically includes bailees and carriers of a hazardous substance.

Echoing the superior court, Petroleum Sales reasons persuasively that it was not the person "having control" over the fuel when the soil and groundwater contamination occurred. Petroleum Sales had no operational or maintenance rights or responsibility at Gold Hill, and it owned neither the fuel nor the tanks into which the fuel was pumped. The supplier's control over its product thus terminated upon the fuel's transfer into Gold Hill's storage tanks.[11]

---

**6.** AS 46.03.826(8) defines "owner and operator" for purposes of AS 46.03.822(a)(1) in relevant part as "in the case of facility, any person owning or operating the facility." The statute fails to define "owner of hazardous substances."

**7.** *See Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1498 (11th Cir.1996); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 156 (7th Cir.1988).

**8.** *Redwing,* 94 F.3d at 1498–99. *Redwing*'s persuasiveness is somewhat diminished by a slight difference between the federal statute implicated there and the Alaska statute at issue in the present case. The CERCLA provision imposing liability on "owners" addresses specifically "owner[s] and operator[s] of a *vessel or a facility,*" 42 U.S.C. § 9607(a)(1) (emphasis added), while AS 46.03.822(a)(1) addresses the "owner of, and the person having control over, the *hazardous substance.*" (Emphasis added.)

**9.** *See Sinka v. Northern Commercial Co.,* 491 P.2d 116, 118 (Alaska 1971) (sale of petroleum products governed by UCC).

**10.** *See Estate of Lewis v. State, Commercial Fisheries Entry Comm'n,* 892 P.2d 175, 183–84 (Alaska 1995) (buyer owned goods upon accepting delivery from seller) (citing AS 45.02.401); *see also In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1101–02 (2d Cir.1990) (title to crude oil passed to buyer in delivery contract when seller delivered and tendered oil at buyer's terminal).

**11.** *See Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 156–58 (7th Cir.1988) (supplier of chemicals not liable as "owner or operator" under CERCLA) (*but see* note 8, *supra* (noting difference between CERCLA and AS 46.03.822 definition of "owner")); *City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646, 656 (D.R.I.1986) (seller of asbestos products

Parks Hiway argues that the definition of person "having control" in AS 46.03.826(4)—which includes persons who handle or transport a hazardous substance *immediately before* its release—effectively modifies the liability requirement under AS 46.03.822(a)(1) that the person have control *"at the time of the release."* (Emphasis added.) It characterizes the delivery of fuel to the Gold Hill station as "a continuous process of pollution" in which "Petroleum Sales is putting fuel into the system, [and] some of the fuel is going out of the system." Under Parks Hiway's "continuous process of pollution" theory, Petroleum Sales thus had control immediately before the fuel began to leak from Gold Hill's defective tanks.

This argument remains factually dubious in light of the extremely slow and virtually undetectable rate of leakage from Gold Hill's tanks. That only one to two quarts of fuel leaked from the tanks each month undercuts Parks Hiway's assertion that the fuel was appreciably spilling out of the tanks as Petroleum Sales filled them.

Parks Hiway's argument also fails under two separate rules of statutory construction. First, under the doctrine of *ejusdem generis,* we interpret the general definition of "having control" in AS 46.03.826(4) in light of the more specific language found in AS 46.03.822(a)(1).[12] Second, Parks Hiway's interpretation would render AS 46.03.822(a)(1)'s phrase "at the time of the release" largely meaningless, violating our preference for a construction that gives effect to all statutory provisions.[13]

### c. *Legislative history*

Parks Hiway contends that the legislative history of AS 46.03.822 reveals the legislature's intent to extend strict liability to fuel suppliers. But Petroleum Sales cites substantial legislative history indicating that the legislature did *not* intend to impose strict liability on fuel suppliers for releases occurring after delivery. Various committees discussing AS 46.03.822 emphasized that the statute "was not intended to make fuel distributors liable for later spills of fuel," and that "[i]f the transporter put the fuel in the tank he was told, he would not be liable." Thus, after "sell[ing] the product to another entity, the distributor would not be responsible for another entity's spill." Moreover, at least one legislator noted the statute's intent to "protect the transporters of hazardous wastes once they had delivered the substance." This legislative history is contrary to Parks Hiway's contention.

Parks Hiway's arguments concerning AS 46.03.822(a)(1) are without merit. We accordingly reject its attempt to hold Petroleum Sales strictly liable under that provision.

### 2. *Petroleum Sales was not an "operator" under AS 46.03.822(a)(2).*

Alaska Statute 46.03.822(a)(2) imposes strict liability upon "the operator of a ... facility, from which there is a release." Parks Hiway argues that the superior court erred by refusing to hold Petroleum Sales liable as an "operator" of the Gold Hill station. It claims that Petroleum Sales had sufficient control over Gold Hill's tanks to incur operator liability under subsection .822(a)(2).

The term "operator" is statutorily defined in relevant part as "any person ... operating the facility,"[14] a circular definition providing little guidance to the present inquiry.[15] However, the overwhelming majority of federal courts construing the equally cir-

---

lacked control over products after manufacture and sale to buyer); *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.,* 617 F.Supp. 126, 133 (D.N.H. 1984) (seller retained no control over asbestos products where buyer purchased products and brought them onto its premises).

**12.** *See State Farm Fire & Cas. Co. v. Bongen,* 925 P.2d 1042, 1046 (Alaska 1996) (holding that specific statutory terms will control more general terms absent clear indication to contrary) (citing *Black's Law Dictionary* (6th ed.1990)).

**13.** *See Homer Elec. Ass'n v. Towsley,* 841 P.2d 1042, 1045 (Alaska 1992) (citing *Alascom, Inc. v. North Slope Borough, Bd. of Equalization,* 659 P.2d 1175, 1178 n. 5 (Alaska 1983)).

**14.** AS 46.03.826(8)(A)(ii).

**15.** *See* 4 William H. Rodgers, Jr., *Environmental Law* § 8.12 (1992).

cular definition of "operator" under CERCLA have concluded that the term should be given its ordinary and natural meaning,[16] and have required a showing that the potentially liable party exercised actual control over the facility, i.e., "someone actively involved in running the facility, typically on a day-to-day, managerial basis."[17] *In United States v. Bestfoods,* the Supreme Court defined an "operator" under CERCLA as "someone who directs the workings of, manages, or conducts the affairs of the facility"; "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[18]

■ In construing "operator" for purposes of AS 46.03.822(a)(2) we are not bound by the various definitions provided above. However, the combined weight of the numerous jurisdictions employing the "actual control" test under CERCLA is a strong endorsement of that approach, which we find persuasive. The actual control test is also supported by our "common usage" approach to statutory construction, under which we construe statutory terms in accordance with their ordinary meaning.[19] The legislative history discussed *supra* also supports an interpretation of "operator" that would exclude petroleum suppliers from that definition.[20]

Petroleum Sales did not exercise the actual control requisite to "operator" liability under

section AS 46.03.822(a)(2). It did not oversee, control, or manage the Gold Hill station, and its only interaction with the station's tanks involved refilling them as requested by Gold Hill. We accordingly reject Parks Hiway's argument on this issue.

3. *Petroleum Sales was not a "transporter" under AS 46.03.822(a)(5).*

Alaska Statute 46.03.822(a)(5) imposes strict liability upon "any person who accepts or accepted any hazardous substances, *other than refined oil,* for transport to disposal or treatment facilities, vessels or sites selected by the person, from which there is a release ... of a hazardous substance."[21] Parks Hiway contends that the superior court erred by refusing to find Petroleum Sales liable as a transporter under this section.

■ The superior court correctly ruled that Petroleum Sales was not a "transporter" as a supplier of gasoline (a "refined oil"), within the meaning of AS 46.03.822(a)(5). Parks Hiway ignores the court's rationale on appeal and instead asserts that subsection .822(a)(5)'s exemption for suppliers of "refined oil" was intended to apply only to common carriers. Neither the statute itself nor the legislative history Parks Hiway relies upon, however, makes such a distinction. Parks Hiway has therefore failed to present the "strong showing" necessary to contradict the statute's facially unambiguous language.[22]

In sum, Parks Hiway has failed to show that AS 46.03.822 extends liability to fuel

---

16. *See id.; see also United States v. Bestfoods,* 524 U.S. 51, 66, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *East Bay Mun. Util. Dist. v. United States Dep't of Commerce,* 142 F.3d 479, 484 (D.C.Cir. 1998).

17. *East Bay,* 142 F.3d at 485 (adopting "actual control" test employed by First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits).

18. *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876.

19. "The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others. In this respect, we have repeatedly stated that unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in

accordance with their common usage." *McDowell v. State,* 957 P.2d 965, 970 (Alaska 1998) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 905 (Alaska 1987)).

20. We decline Parks Hiway's invitation to follow *Shell Oil Co. v. Meyer,* 684 N.E.2d 504 (Ind.App. 1997), *rev'd in part,* 705 N.E.2d 962 (Ind.1998).

21. AS 46.03.822(a)(5) (emphasis added).

22. "Where a statute's meaning appears clear and unambiguous, ... the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." *University of Alaska v. Tumeo,* 933 P.2d 1147, 1152 (Alaska 1997) (citing *Lagos v. City and Borough of Sitka,* 823 P.2d 641, 643 (Alaska 1991)); *see also University of Alaska v. Geistauts,* 666 P.2d 424, 428 n. 5 (Alaska 1983).

suppliers for contamination occurring after sale and delivery of their product. We therefore reject its attempt to hold Petroleum Sales strictly liable as an "owner," "operator," "person having control," or "transporter" under this statute.

### C. The Superior Court Did Not Err by Rejecting Parks Hiway's Trespass Theory of Liability.

Trespass is an unauthorized intrusion or invasion of another's land,[23] including subsurface areas.[24] Trespass liability may result from an actor's intentional, negligent, or ultrahazardous conduct.[25]

The superior court rejected Parks Hiway's attempt to hold Petroleum Sales liable for common law trespass, ruling that Petroleum Sales did not own or control the fuel when it contaminated the groundwater beneath Parks Hiway's property. Parks Hiway challenges this ruling, arguing that ownership of the invading substance is irrelevant for purposes of trespass liability where the actor "sets in motion" the release of the substance.

This court has not addressed the issue of whether a supplier of a substance is liable for trespass when, after delivery to the buyer, the substance escapes and invades neighboring land. Parks Hiway cites no authority explicitly recognizing a cause of action against the supplier under such circumstances.[26]

Several cases have held that courts do not impose trespass liability on sellers for injuries caused by their product after it has left the ownership and possession of the sellers.[27] The courts in City of *Bloomington v. Westinghouse Electric Corp.*,[28] *Jordan v. Southern Wood Piedmont Co.*,[29] *Town of Hooksett v. W.R. Grace & Co.*,[30] and *City of Manchester v. National Gypsum Co.*[31] accordingly refused to hold suppliers liable for trespass under facts roughly analogous to the present case.

The general consensus thus suggests that ownership or control of the intruding instrumentality is dispositive of an actor's trespass liability. Because its ownership and control over the fuel terminated upon the product's transfer into Gold Hill's tanks, Petroleum Sales bears no trespass liability for the fuel's subsequent migration.

Moreover, "a trespass action will exist if there is a *direct* causal relation between the conduct of the actor and the intrusion of

---

**23.** See *Brown Jug, Inc. v. International Bhd. of Teamsters*, 688 P.2d 932, 938 (Alaska 1984) (citing Restatement (Second) of Torts §§ 163, 165 (1965)).

**24.** See Restatement (Second) of Torts § 159 (1965).

**25.** See Restatement (Second) of Torts §§ 158, 165 (1965).

**26.** Parks Hiway's reliance upon *McDowell v. State*, 957 P.2d 965 (Alaska 1998), is misplaced. In *McDowell*, this court determined the appropriate statute of limitations for trespass actions, but noted the "limited nature" of its holding. *Id.* at 969–70 n. 8. We did not consider there "whether contamination resulting from unintentional acts would satisfy the elements of a trespass claim." *Id.*

The other cases Parks Hiway cites—*Shockley v. Hoechst Celanese Corp.*, 793 F.Supp. 670, 674 (D.S.C.1992), *Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064 (Colo.App. 1990), and *Lever Bros. Co. v. Langdoc*, 655 N.E.2d 577 (Ind.App.1995)—are inapposite because they involved defendants who owned or controlled the trespassing instrumentality. *Fortier v. Flambeau Plastics Co.*, 164 Wis.2d 639, 476

N.W.2d 593, 598 (1991), is likewise distinguishable, as it involved defendants who dumped their hazardous waste into a municipal landfill rather than selling and transferring control to a buyer.

**27.** See, e.g., City of Bloomington v. Westinghouse Elec. Corp., 891 F.2d 611, 615 (7th Cir.1989).

**28.** *Id.* (holding chemical manufacturer not liable for trespass where product caused contamination after sale and delivery to buyer).

**29.** 805 F.Supp. 1575, 1582–83 (S.D.Ga.1992) (holding chemical supplier not liable for trespass by product after sale and delivery to buyer).

**30.** 617 F.Supp. 126, 133 (D.N.H.1984) (holding supplier of asbestos products not liable for trespass where contamination occurred after sale to buyer; supplier's ownership and control of products ceased at time of sale).

**31.** 637 F.Supp. 646, 656 (D.R.I.1986) (supplier of asbestos products not liable for trespass where contamination occurred after sale to buyer; supplier's ownership and control over products ceased at time of sale).

foreign matter upon the possessor's land."[32] Actors therefore assume liability only when they "set[ ] in motion a force which, *in the usual course of events*, will damage property of another."[33] As a supplier of gasoline to Gold Hill, Petroleum Sales merely performed a delivery function which, "in the usual course of events," would not contaminate neighboring property. The direct causal connection required to establish trespass is thus absent from the present case. We accordingly reject Parks Hiway's trespass argument.

D. *The Superior Court Did Not Err by Rejecting Parks Hiway's Attempt to Hold Petroleum Sales Strictly Liable Under the Common Law Doctrine of Ultrahazardous Activity.*

▮ Strict liability attaches to actors engaged in ultrahazardous activities.[34] An activity is ultrahazardous if it "(a) necessarily involves a risk of serious harm ... which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage."[35] "What facts are necessary to make an activity ultrahazardous ... is a matter for the judgment of the court" rather than the jury.[36] In *Matomco Oil Co. v. Arctic Mechanical, Inc.*, we suggested that hauling gasoline as freight represents an ultrahazardous activity for which strict liability would apply.[37]

▮ The superior court, however, ruled that although transporting gasoline is an "ultrahazardous activity," strict liability would attach only to harm arising "from the risk which, being incapable of elimination by utmost care, makes the activity ultrahazardous." Reasoning that transporting fuel was deemed ultrahazardous due solely to gasoline's inherent volatility, the superior court refused to extend strict liability to harm falling outside the scope of the risk of explosion. The court thus rejected Parks Hiway's attempt to hold Petroleum Sales strictly liable for environmental damage resulting from the fuel's delivery. We agree with the superior court's reasoning.[38]

▮ On appeal, Parks Hiway refines its argument to assert that transporting gasoline *to defective tanks* should constitute an "ultrahazardous" activity warranting strict liability. Parks Hiway relies upon *City of Northglenn v. Chevron U.S.A., Inc.*,[39] and *Yommer v. McKenzie*,[40] which held operators of large underground gasoline storage facilities strictly liable for the contamination of neighboring property. But the persuasive value of *Northglenn* and *Yommer* to the present case remains extremely limited, as both opinions involved facility owners rather than suppliers or transporters of gasoline.

In the analogous case of *City of Bloomington v. Westinghouse Electric Corp.*, the court

**32.** *Lever Bros. Co. v. Langdoc*, 655 N.E.2d 577, 582 (Ind.App.1995) (emphasis added).

**33.** *Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1067 (Colo.App.1990) (emphasis added).

**34.** *See Matomco Oil Co. v. Arctic Mech., Inc.*, 796 P.2d 1336, 1341–42 (Alaska 1990).

**35.** *Id.* at 1341–42 n. 13 (citing Restatement of Torts § 520 (1938)). We have adopted the First Restatement's "ultrahazardous" standard over the "abnormally dangerous" test of the Second Restatement. *Id.* at 1341 n. 12; *State Farm Fire & Cas. Co. v. Municipality of Anchorage*, 788 P.2d 726, 729 (Alaska 1990).

**36.** *Matomco*, 796 P.2d at 1341 (quoting Restatement of Torts § 520 cmt. h (1938)). *Compare Yukon Equip., Inc. v. Fireman's Fund Ins. Co.*, 585 P.2d 1206, 1208–09 (Alaska 1978) (strict liability applicable in all cases involving explosives) *with State Farm Fire & Cas. Co. v. Municipality of Anchorage*, 788 P.2d at 729 (operation of

water delivery systems not ultrahazardous) *and Matomco*, 796 P.2d at 1341–42 (welding, buffing, or grinding of petroleum tankers not ultrahazardous).

**37.** 796 P.2d at 1341 n. 11 (citing *Siegler v. Kuhlman*, 81 Wash.2d 448, 502 P.2d 1181, 1184–85 (1972), *cert. denied*, 411 U.S. 983, 93 S.Ct. 2275, 36 L.Ed.2d 959 (1973)) (noting Washington court's conclusion that "hauling gasoline as freight 'takes on uniquely hazardous characteristics' ").

**38.** *See* Restatement of Torts § 519 cmt. b (1938). We also find it noteworthy that the legislature expressly exempted gasoline transporters from strict liability under AS 46.03.822(a)(5).

**39.** 519 F.Supp. 515, 515–16 (D.Colo.1981).

**40.** 255 Md. 220, 257 A.2d 138, 140–42 (App. 1969) (applying less stringent "abnormally dangerous" standard of Second Restatement).

refused to hold a seller of products containing toxic components strictly liable where the contamination occurred after the buyer's purchase.[41] Emphasizing that even strict liability contains a causation element, the court reasoned that "the harm ... was not caused by any abnormally dangerous activity of [the seller] but by the buyer's failure to safeguard its waste."[42] The *Bloomington* court was thus "unwilling to extend the doctrine of strict liability for an abnormally dangerous activity to the party whose activity did not cause the injury."[43]

We agree with *Bloomington* and refuse to hold Petroleum Sales strictly liable for contamination occurring after it delivered its product to Gold Hill. As in that case, Parks Hiway's injury resulted from Gold Hill's failure to properly maintain its tanks rather than Petroleum Sales' delivery of the fuel.

### E. The Superior Court Did Not Err by Refusing to Hold Petroleum Sales Liable for Private Nuisance.

Private nuisance liability results from an intentional and unreasonable interference with another's use and enjoyment of his or her own property.[44] Unintentional conduct may also warrant nuisance liability if negligent, reckless, or abnormally dangerous.[45] To incur liability, an actor's conduct must be a substantial factor in causing the nuisance.[46]

The superior court rejected Parks Hiway's private nuisance theory, reasoning that "[o]ne who has no control over property at the time of the nuisance cannot be held liable therefor." Echoing the court, Petroleum Sales accurately cites numerous cases that have refused to extend nuisance liability to hazardous material vendors uninvolved in the operation of the facility from which the pollution eventually migrated.[47] These courts agree that "liability for damage caused by a nuisance turns on whether the defendants were in control over the instrumentality alleged to constitute the nuisance."[48] Moreover, at least one court has noted the absence of cases holding manufacturers liable for nuisance claims arising from the use of their products after sale.[49] The Restatement likewise couches its nuisance liability rule in terms of "the possessor of [the] land" from which the nuisance emanates.[50]

Against this apparent judicial consensus, Parks Hiway cites *Shockley v. Hoechst Celanese Corp.*[51] and *Northridge Co. v. W.R. Grace & Co.*[52] *Shockley* involved a manufacturer who "knowingly delivered rusty, aging, and leaking barrels of hazardous chemicals" to a waste disposal site operated by another entity.[53] Because the condition causing the nuisance, i.e., the leaking barrels, existed when the manufacturer delivered them to the property from which the contamination ultimately emanated, the court concluded

41. 891 F.2d 611, 615–16 (7th Cir.1989) (applying Second Restatement's "abnormally dangerous" standard).

42. *Id.* at 615.

43. *Id.* at 616.

44. *See* Restatement (Second) of Torts § 822(a) (1965).

45. *See* Restatement (Second) of Torts § 822(b) (1965). Alaska statutorily defines private nuisance as "a substantial and unreasonable interference with the use and enjoyment of real property, including water." AS 09.45.255.

46. *See* Restatement (Second) of Torts § 834 (1965).

47. *See Tioga Pub. Sch. Dist. No. 15 of Williams County v. U.S. Gypsum Co.*, 984 F.2d 915, 920–21 (8th Cir.1993); *City of Bloomington v. Westinghouse Elec. Corp.*, 891 F.2d 611, 614 (7th Cir. 1989); *Montana Pole & Treating Plant. v. I.F. Laucks & Co.*, 775 F.Supp. 1339, 1348 n. 10 (D.Mont.1991); *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.*, 617 F.Supp. 126, 133 (D.N.H. 1984); *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646, 656 (D.R.I.1986).

48. *City of Manchester*, 637 F.Supp. at 656; *U.S. Gypsum*, 984 F.2d at 920.

49. *See City of Bloomington*, 891 F.2d at 614.

50. Restatement (Second) of Torts § 839 (1965).

51. 793 F.Supp. 670 (D.S.C.1992), *rev'd in part on other grounds*, 996 F.2d 1212 (4th Cir.1993).

52. 205 Wis.2d 267, 556 N.W.2d 345 (App.1996).

53. 793 F.Supp. at 674.

that the manufacturer had satisfied the Restatement's "substantial factor" test.[54] The present case is distinguishable from *Shockley* because here the fuel delivered was not defective, whereas the barrels in *Shockley* were.

*Northridge* involved a suit for private nuisance against an asbestos manufacturer whose product was installed in a shopping mall.[55] The Wisconsin appellate court affirmed the manufacturer's nuisance liability, reasoning that "one who has erected a nuisance will be responsible for its continuance, even after he has parted with the title and the possession."[56]

*Northridge* is distinguishable from the present case because there is no evidence that Petroleum Sales had any reason to know that a nuisance would result from filling Gold Hill's tanks. Moreover, Petroleum Sales did not "erect a nuisance" by delivering gasoline to Gold Hill's leaking tanks; the defective tanks, rather than the fuel migrating from them, constituted the nuisance.

Petroleum Sales did not control either Gold Hill's tanks or the fuel when the contamination of Parks Hiway's groundwater occurred. It was therefore not a substantial factor in creating the alleged nuisance and should bear no liability.

F. *The Superior Court Did Not Err by Rejecting Parks Hiway's Negligence Claim.*

 The tort of negligence consists of four separate and distinct elements: (1) duty, (2) breach of duty, (3) causation, and (4) harm.[57] The existence and extent of a duty is a question of law.[58] The superior court rejected Parks Hiway's negligence claim at the threshold level, ruling that Petroleum Sales owed no affirmative duty to investigate the status of Gold Hill's tanks before transferring fuel into them. The court adopted a rule requiring claimants to show that a petroleum supplier had actual knowledge of the tanks' defect.

Parks Hiway argues on appeal that (1) negligence requires only constructive knowledge; and (2) AS 46.03.822(b)(1)(B)(ii), 18 AAC 78 .040(b)(4), and 42 U.S.C. § 6991a(a)(5) impose a duty upon Petroleum Sales to investigate and confirm the integrity of Gold Hill's tanks before filling them.

 We decline to address whether a petroleum supplier's negligence liability requires actual or constructive knowledge of the tanks' defective condition,[59] however, because Parks Hiway has not presented sufficient evidence to create a genuine issue of fact even under the "constructive knowledge" approach. The statutory and regulatory scheme cited by Parks Hiway imposes no affirmative duty upon petroleum suppliers to confirm the structural integrity of a customer's tank before depositing fuel into it. First, 18 AAC 78.040(b)(4) expressly applies only to station owners, requiring them to inform distributors of the owner's tank registration numbers.[60] Second, contrary to

---

54. See id.

55. 556 N.W.2d at 351.

56. *Id.* (quoting *Lohmiller v. Indian Ford Water–Power Co.,* 51 Wis. 683, 8 N.W. 601, 602 (1881)).

57. See *Lyons v. Midnight Sun Transp. Servs., Inc.,* 928 P.2d 1202, 1204 (Alaska 1996) (citing *Alvey v. Pioneer Oilfield Servs., Inc.,* 648 P.2d 599, 600 (Alaska 1982)).

58. See *Mulvihill v. Union Oil Co.,* 859 P.2d 1310, 1314 n. 4 (Alaska 1993).

59. The superior court relied on *Citizens & S. Trust Co. v. Phillips Petroleum Co.,* 192 Ga.App. 499, 385 S.E.2d 426, 428–29 (1989), which noted that a petroleum supplier's negligence may only be established by showing the supplier's actual knowledge of the storage facility's defects. Other cases, however, have at least tacitly recognized that liability will attach where fuel suppliers have constructive knowledge of the facility's defect. See, e.g., *Nodine v. Terpening Trucking Co.,* 64 A.D.2d 808, 407 N.Y.S.2d 277, 278 (1978); *Harris v. Northwest Natural Gas Co.,* 284 Or. 571, 588 P.2d 18, 20 n. 5 (1978).

60. 18 AAC 78.040(b)(4) provides in relevant part:

(b) The owner or operator shall ensure that
. . . .
(4) the distributor is provided with the UST registration number before the transfer is made. . . .

Subsection (b)(4) may imply a duty on the part of a distributor not to make deliveries to unregistered tanks. But the tanks in this case were all registered.

Parks Hiway's assertion, AS 46.03.822(b)(1)(B)(ii) does not impose a duty to exercise reasonable care to prevent the negligent acts of third parties; instead, it provides a defensive escape hatch for otherwise liable parties.[61] Third, 42 U.S.C. § 6991a(5) merely requires Petroleum Sales to inform Gold Hill of the station's tank notification requirements under federal law;[62] it does not obligate suppliers to verify the integrity of the tank itself. Contrary to Parks Hiway's assertion, none of the statutes and regulations cited above impose a duty on petroleum suppliers to "investigate[ ] the public record."

Drawing all reasonable inferences in Parks Hiway's favor, Petroleum Sales owed no duty to investigate the soundness of the tanks under the circumstances of this case. We accordingly affirm the rejection of Parks Hiway's negligence claim.[63]

## IV. CONCLUSION

As a fuel distributor with no ownership, authority, or control over the Gold Hill Service Station, and no reason to know that Gold Hill's tanks were leaking, Petroleum Sales is not liable for contamination caused by the leaking tanks. We therefore AFFIRM the superior court's ruling in all respects.

---

**61.** AS 46.03.822(b)(1)(B)(ii) provides in relevant part:

> (b) In an action to recover damages or costs, a person otherwise liable under this section is relieved from liability under this section if the person proves
>
> (1) that the release or threatened release of the hazardous substance to which the damages relate occurred solely as a result of
>
> . . . .
>
> (B) except as provided under AS 46.03.823(c) and 46.03.825(d), an intentional or negligent act or omission of a third party, other than a party or its agents in privity of contract with, or employed by, the person, and that the person
>
> . . . .

> (ii) took reasonable precautions against the act or omission of the third party and against the consequences of the act or omission. . . .

**62.** 42 U.S.C. § 6991a(5) (1994) provides in relevant part: "[A]ny person who deposits regulated substances in an underground storage tank shall reasonably notify the owner or operator of such tank of the owner's notification requirements pursuant to this subsection."

**63.** Parks Hiway also raises two procedural claims of error. It argues that the court should have stricken certain affidavits and should have allowed it to file a third amended complaint after summary judgment was granted. We have reviewed these claims and find no abuse of discretion.